UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UPEQUITY SPV1, LLC,

    Plaintiff,

v.   Case No. 8:24-cv-00842-TPB-NHA

MEGAN GLENNON,

    Defendant.
_____/

# REPORT AND RECOMMENDATION

Plaintiff UpEquity SPV1, LLC moves for final default judgment against Defendant Megan Glennon and asks the Court to award Plaintiff damages in the amount of $152,817.14. Doc. 22. I find Plaintiff has pleaded facts sufficient to support a prima facie case of breach of contract. I also find that the record supports an award of $133,079.14 in damages. After a hearing discussing my damages calculation I gave Plaintiff an opportunity to present evidence supporting its larger damages request. *See* Doc. 31. Plaintiff instead consented to the Court's damages calculation. Doc. 33. Therefore, I respectfully recommend that the Court partially grant Plaintiff's Motion for Default Judgment, enter judgment for Plaintiff, and award damages in the amount of $133,079.14.

## I.     Background

Plaintiff, UpEquity SPV1, LLC is a Texas limited liability company dealing in real estate and financial technology. Compl. (Doc. 1), ¶¶ 1, 6. Plaintiff runs a program known as the "Trade Up" Program through which it buys homeowners' current homes, so the homeowners can use the equity in those homes to purchase new homes. *Id.* ¶¶ 7-8.

On October 31, 2022, Plaintiff entered into a Trade Up Agreement (the "Contract") with Defendant Megan Glennon, a citizen of Florida. *Id.* ¶¶ 2, 9. The contract defined various terms, of which five are relevant here:

**UpEquity Purchase Price.** Pursuant to the Contract, Plaintiff agreed to purchase Defendant's home, located at 5705 Duval Street, Austin, Texas ("The Property" or "Old Home"), for $526,366 ("UpEquity Purchase Price"). *Id.* ¶ 9. Plaintiff paid Defendant the agreed-upon UpEquity Purchase Price of $526,366 and took title to the property. *Id.* ¶ 10.

**UpEquity Carrying Costs.** The Contract required Plaintiff to list the Property with an agent of Defendant's choosing, and to cover certain costs "in the course of legally owning [her] Old Home, such as . . . insurance and certain administrative costs (collectively, '**Carrying Costs**')." Contract (Doc. 1-1), p. 5 (emphasis added).

**UpEquity Cost Basis.** Under the contract, the Carrying Costs, plus the UpEquity Purchase Price of $526,366, made up the "UpEquity Cost Basis." *Id.*

**UpEquity Resale Costs.** The Contract also provided that, "[u]pon Resale, [Plaintiff] will incur certain costs including, but not limited to . . . (1) "[t]he Costs, fees, and concessions associated with [Plaintiff]'s selling of [Defendant's] Old Home to the subsequent buyer (notably, the real estate agent commission); and (2) property taxes, assessments, and Homeowner's Association Dues (collectively, '**Resale Costs**')." *Id.* (emphasis added).

**Net Resale Price.** Under the Contract, the "Net Resale Price" is "the price at which [Plaintiff's] Old Home sells at Resale ('Gross Resale Price') less the Resale Costs." *Id.*

Under the Contract, if the Net Resale Price of the property was less than the UpEquity Cost Basis, then Plaintiff was required to "remit the deficit to UpEquity within 14 calendar days of the closing of the Resale." *Id.* Defendant agreed to these terms in the parties' Contract. *Id.* at p. 7.

Again, Plaintiff purchased the Defendant's home for $526,366. On or around April 21, 2023, Defendant's home sold for $447,000. Compl. (Doc. 1), ¶ 14. Plaintiff alleges that UpEquity Cost Basis exceeded the Net Resale Price by $152,817.14. *Id.* ¶¶ 15-16.

On October 18, 2023, Plaintiff sent Defendant a final invoice by letter and through a billing software platform, bill.com (the "Final Invoice"). Compl. (Doc. 1) at ¶ 17; *see* Compl. (Doc. 1-2). Plaintiff alleges that Defendant has not communicated with Plaintiff since sending the Final Invoice, has not remitted

payment of the outstanding balance, and has thus breached the Contract. Compl. (Doc. 1), ¶ 18.

## II. Procedural History

On April 4, 2024, Plaintiff filed a one-count complaint against Defendant, alleging breach of contract for failure to pay an outstanding balance of $152,817.14. Compl. (Doc. 1). Plaintiff served Defendant on April 10, 2024 (Doc. 8), but Defendant did not appear in the case. On June 18, 2024, after Defendant failed to timely answer or otherwise defend the lawsuit, Plaintiff moved for entry of clerk's default. Doc. 10. The Court granted Plaintiff's motion (Doc. 11), and the Clerk entered a default against Defendant (Doc. 12).

On September 23, 2024, Plaintiff filed the amended motion for default judgment that is now before the Court. Doc. 22. The Court held hearings on the motion to discuss the damages calculation on January 14, 2025 and April 7, 2025. Docs. 26, 31.

At no point during these proceedings has Defendant appeared or demonstrated an intent to defend this case.

## III. Standard of Review

"When a defendant has failed to plead or defend, a district court may enter judgment by default." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1244 (11th Cir. 2015) (citing FED. R. CIV. P. 5(b)(2)). A Clerk's default under Rule 55(a) deems a defendant to admit a plaintiff's well-pleaded allegations of

fact. *Id*. at 1245 (citing *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005)). However, a defendant "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Cotton*, 402 F.3d at 1278 (citation and quotations omitted).

So, notwithstanding entry of a clerk's default, the Court may enter a default judgment under Rule 55(b) only where the pleadings sufficiently support a judgment. *Id.* In deciding a motion for default judgment, the Court should assess the pleadings by a standard "akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain*, 789 F.3d at 1245 (citation omitted). In other words, a court may enter a default judgment only where a pleading contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

If a plaintiff is entitled to default judgment, then the court must also consider whether the plaintiff is entitled to the damages it requests. The damages a plaintiff requests are not deemed proven simply by default; rather, the Court must still determine the amount and type of damages to award. *Anheuser Busch*, 317 F.3d at 1266; *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1543–44 (11th Cir. 1985).

If, to enter or effectuate judgment, it is necessary to conduct an accounting to determine damages, the court may conduct hearings or make

5

referrals as it deems necessary. FED. R. CIV. P. 55(b)(2). But damages may be awarded "without a hearing [if] the amount claimed is a liquidated sum or one capable of mathematical calculation," as long as "all essential evidence is already of record." *S.E.C. v. Smyth*, 420 F.3d 1225, 1231, 1232, 1233 n.13 (11th Cir. 2005) (quoting *Adolph*, 777 F.2d at 1544); *see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (a hearing is unnecessary if sufficient evidence supports the request for damages).

**IV. Analysis**

    1. Subject Matter Jurisdiction

As a preliminary matter, the Court has diversity jurisdiction over this case. Plaintiff, UpEquity SPV1, LLC, is a limited liability company (Compl. (Doc. 1), ¶ 1) whose sole member—LnderLab, Inc.— is a citizen of the State of Texas. Doc. 22, ¶ 3. Defendant is a citizen of Florida. Compl. (Doc. 1), ¶ 2. The amount in controversy is $152,817.14, exclusive of interest, and thus exceeds $75,000. *Id.* at ¶ 15. This Court, therefore, has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

    2. Proper Service of the Complaint

Next, Plaintiff has properly served Defendant. In seeking a default judgment, Plaintiff bears the burden of establishing proper service of the complaint. "In the absence of service of process (or waiver of service by the

defendant), a court ordinarily may not exercise power over a party the complaint names as defendant." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). And, "[g]enerally, where service of process is insufficient, the court has no power to render judgment." *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1299 (11th Cir. 2003).

Federal Rule of Civil Procedure 4(e) governs the service of process on individuals. Rule 4(e)(2)(A) provides that an "individual may be served in a judicial district of the United States by. . . delivering a copy of the summons and of the complaint to the individual personally." FED. R. CIV. P. 4(e)(2)(A). Here, Plaintiff did just that; on January 10, 2024, the process server "deliver[ed] a true copy of the summons [and] complaint . . . to: Megan Glennon." Doc. 8, p. 1. Thus, Plaintiff properly served Defendant.

Defendant had until May 1, 2024—21 days after being served with the summons and complaint—to answer or otherwise respond to the complaint. FED. R. CIV. P.  12(a)(1)(A). She did not, and Plaintiff moved for clerk's default (Doc. 10), which the Court granted (Doc. 11). Thus, the clerk's default (Doc. 12) was properly entered.

    3. <u>Personal Jurisdiction</u>

The Court has personal jurisdiction over the Defendant. In addition to ensuring she was properly served, a court must also ensure it has personal jurisdiction over a defaulting defendant. Rule 4(k)(1)(A) provides that "serving

7

a summons or filing a waiver of service establishes personal jurisdiction over a defendant[] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." FED. R. CIV. P. 4(k)(1)(A).

Plaintiff served Defendant in Florida on April 10, 2024 (Doc. 8), satisfying the first requirement of Rule 4(k)(1)(A). As to the second requirement of Rule 4(k)(1)(A), Plaintiff alleges that Defendant is "domiciled" in the Middle District of Florida. Compl. (Doc. 1) ¶ 4. This is sufficient to establish personal jurisdiction over Defendant. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)) (observing that "the paradigm forum for the exercise of general jurisdiction is the individual's domicile.").

Given that Defendant resides in the Middle District of Florida, the Due Process Clause is satisfied by the Court's exercise of personal jurisdiction over her. *Daimler*, 571 U.S. at 139 (quoting *Goodyear*, 564 U.S. at 919) (explaining that Due Process Clause is satisfied when a defendant is at home in the forum state or "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'").

4. Choice of Law

Before evaluating whether Plaintiff's allegations sufficiently support its breach of contract claim, the Court must determine what law governs the claim. A federal court exercising diversity jurisdiction applies the forum state's

8

choice-of-law rules. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998).

In Florida, in the absence of an applicable choice-of-law provision, *lex loci contractus* directs that the contract is governed by the law of the state in which the contract is made. *See Fioretti v. Massachusetts General Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995). "The determination of where a contract was executed . . . requires a determination of where the last act necessary to complete the contract [wa]s done." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092–93 (11th Cir. 2004) (internal quotation marks omitted). "The last act necessary to complete a contract is the offeree's communication of acceptance to the offeror." *Id.* at 1093. Here, Defendant (offeree) communicated acceptance when she signed the UpEquity Agreement in Texas on October 31, 2022. Doc. 22, ¶ 5. Thus, Texas law applies.

5. <u>Breach of Contract</u>

In Texas, the traditional elements of a breach of contract claim are: (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant failed to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018); *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

Accepting Plaintiff's well-pleaded allegations as true, Plaintiff has stated a valid claim for breach of contract against Defendant.

### i.  *A Valid Contract Exists*

First, Plaintiff alleges facts demonstrating a valid, enforceable agreement between the parties. Compl. (Doc. 1), ¶ 9. Specifically, Plaintiff alleges that its authorized representative signed the Trade Up Service Agreement (which Plaintiff has provided and which contains provisions under which each side receives consideration) on October 27, 2022; that Plaintiff sent the Trade Up Service Agreement to Defendant, thereby formally extending her an offer; and that Defendant signed the agreement on October 31, 2022, thereby accepting Plaintiff's offer and creating a valid contract ("the Contract"). Contract (Doc. 1-1), p. 7.

### ii.  *Plaintiff Fully Performed Under the Contract*

Second, Plaintiff pleaded facts showing that it "fully performed under the Contract." Compl. (Doc. 1), ¶ 20. Pursuant to the Contract, Plaintiff was required to purchase Defendant's Property for the UpEquity Purchase Price of $526,366. *Id.* ¶ 10; Contract (Doc. 1-1), p. 4. Plaintiff was then obligated to list the Property for sale, incurring various costs, and to "keep the property on the market with the listing agent of [Defendant's choice]," and resell the home. *Id.* at pp. 4-5.

Here, Plaintiff alleges that on October 31, 2022, it paid Defendant the purchase price of $526,366 and took title to the property, as agreed. Compl. (Doc. 1), ¶ 10. Plaintiff listed the property with Outlaw Realty, selected by Defendant. *See* Compl. (Doc. 1-2). Plaintiff then incurred various costs in owning and reselling the home, and, on or around April 21, 2023, Plaintiff resold Defendant's home for $447,000. Compl. (Doc. 1), ¶ 14. Plaintiff has sufficiently pleaded that it performed its obligations under the contract.

### iii.  *Defendant Breached the Contract*

Third, Plaintiff alleges facts demonstrating a breach; specifically, Plaintiff alleges that Defendant "fail[ed] to pay the [o]utstanding [b]alance as required by the terms of the Contract." Compl. (Doc. 1), ¶ 21.

Under the Contract, if the "Net Resale Price" of the property was less than the UpEquity Cost Basis (the Carrying Costs together with the UpEquity Purchase Price), then Plaintiff was required to "remit the deficit to UpEquity within 14 calendar days of the closing of the Resale." Contract Doc. (1-1), p. 5.

Again, the Net Resale Price is the resale price, minus the Resale Costs. Here, Plaintiff sold Defendant's home for $447,000. But, it incurred the following resale costs:

| **Identifiable Resale Costs** | Amount |
|---|---|
| County Taxes 01/01/2023 to 09/29/2023 | $8,265.50 |
| Recording Fee - UCC Termination | $65.00 |
| E-Recording Fee to Simplified | $5.00 |
| Listing Agent Commission to Outlaw Realty | $13,410.00 |

11

| | |
|---|---|
| Selling Agent Commission to Compass RE Texas, LLC | $13,410.00 |
| Title - Deed Preparation to Betters Law Firm | $75.00 |
| Title - Tax Search Fee to CertSimple, Inc. | $48.71 |
| Title - Owner's Title Policy to Southwest Land Title Insurance | $2,661.00 |
| Title – State of Texas Policy Guarantee Fee | $2.00 |
| Title – Settlement or Closing Fee to Blueprint Title TX | $400.00 |
| County Taxes 12/14/2022 to 1/02/2023 | $549.00 |
| Option Fee Termination Credit | ($250) |
| **Total:** | **$38,641.21** |

Doc. 1-2. Thus, the Net Resale Price was $447,000−$38,641.21, or $408,358.79.

The UpEquity Cost Basis is the combination of the UpEquity Purchase Price and its Carrying Costs. Contract (Doc. 1-1), p. 5. Plaintiff paid a purchase price of $526,366 for Defendant's home. Doc. 1 ¶ 9. Based on the final invoice attached to Plaintiff's Complaint (Doc. 1-2)) and the Contract's definition of Carrying Costs ("insurance and administrative costs" incurred during UpEquity's ownership of Defendant's Property) (Contract (Doc. 1-1), p. 5), it appears that Plaintiff incurred the following Carrying Costs:

| **Identifiable Carrying Costs**[1] | **Amount** |
|---|---|
| Reimbursement to UpEquity for Lawn Care Invoice | $200.00 |
| Reimbursement to UpEquity for HVAC | $1,085.43 |
| Reimbursement to UpEquity for COA Energy Audit | $119.00 |
| Reimbursement to UpEquity for HVAC | $5,858.40 |
| Reimbursement to UpEquity for HVAC Repairs | $8,766.60 |
| Credit for HVAC Repairs | ($957.50) |
| **Total:** | **$15,071.93** |

---

[1] The identifiable Carrying Costs are listed at lines 18, 20, 22, 23, and 24 of Plaintiff's invoice. Compl. (Doc. 1-2).

12

Thus, the UpEquity Cost Basis is the sum of $526,366 and $15,071.93, or $541,437.93.

Therefore, the UpEquity Cost Basis ($541,437.93) exceeded the Net Resale Price ($408,358.79) by $133,079.14. Under the Contract, Defendant was responsible for paying this deficit "within 14 calendar days of the closing of the Resale." Contract (Doc. 1-1), p. 5. Plaintiff alleges she did not. Compl. (Doc. 1), ¶ 21. Thus, Plaintiff has pleaded breach.

> iv.   *Plaintiff Sustained Damages from Defendant's Breach*

Finally, Plaintiff must prove that it sustained damages due to Defendant's breach. *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 890. A monetary loss is a form of damages. *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 707 (Tex. 2019). Plaintiff alleges that Defendant's breach deprived Plaintiff of money Defendant owed to Plaintiff. Compl. (Doc. 1), ¶ 22. Defendant has sufficiently pleaded that it sustained damages due to the breach.

   6. Calculation of Damages

Once a plaintiff establishes the elements of its claim, the Court must determine whether the record contains sufficient evidence to allow the Court to calculate the damages owed. Here, the Court finds evidence sufficient to calculate a damages award, but does not find that the evidence supports the Plaintiff's initial request for $152,817.14. *See* Compl. (Doc. 1), ¶ 22. Rather, as

13

demonstrated above, the record demonstrates that Plaintiff suffered damages in the amount of $133,079.14. Plaintiff was given the opportunity to present evidence in support of an alternate damages award (*see* Doc. 31), but instead has consented to the Court's calculation (Doc. 33).

I find that Plaintiff has demonstrated its entitlement to an award of $133,079.14, the difference between the UpEquity Cost Basis and the Net Resale Price.

## V.  Conclusion

For the reasons stated, I respectfully RECOMMEND that the District Court:

(1) GRANT Plaintiff's motion for final judgment against Defendant, MEGAN GLENNON, and in favor of Plaintiff, UPEQUITY SPV1, LLC; and

(2) Award Plaintiff $133,079.14 in damages.

Submitted for the District Court's consideration on April 9, 2025.

_____
NATALIE HIRT ADAMS
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1. To expedite resolution, parties may file a joint notice waiving the 14-day objection period.